IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JUNWU GONG, | ) | |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| v. | ) | |
| | ) | |
| STUART M. SARNOFF, | ) | |
| O'MELVENY & MYERS LLP, | ) | |
| CARL M. STANTON, CITY OF NEW | ) | JURY DEMANDED |
| YORK, OFFICER JOHN DOE 1, | ) | |
| OFFICER JOHN DOE 2, | ) | |
| OFFICER JOHN DOE 3, | ) | |
| OFFICER JANE DOE, | ) | |
| | ) | |
| Defendants. | ) | |

## BACKGROUND

1.      In order to properly frame the Plaintiff's claims, some background information is necessary.

2.      There are numerous businesses from the United States that make significant profits from business in the People's Republic of China ("PRC").

3.      As a precondition to maintaining such lucrative business, the sole ruling political party of the PRC, the Chinese Communist Party ("CCP"), demands that all businesses, including those of foreign origin, do as the CCP commands.

4.      Beginning in the early 1990s, the CCP enacted regulations which mandated that all businesses operating in China must have a CCP "committee" as part of said company's management structure, and that such committee would, *de facto*, be in at least partial control of that company. *See* "Party Committees in Chinese Companies" by Borst, Nicholas. *Prevailing Winds*, June 2021. (Attached hereto as Exhibit "A").

5.      This mandate included businesses that originated from foreign countries, and is particularly significant when applied to businesses from the United States. *Id*.

6.      With the rise to power of current president Xi Jingping, this "Party Committees" policy was giver greater significance, such that by 2017 it was added to the CCP's constitution. *Id*.

7.      Therefore, pursuant to the Constitution of the Communist Party of China (see, *id*), the CCP Committees in every private company and /or business operating in China are now expected to, *inter alia*:

   a.   Maintain control of the enterprise;

   b.   Implement principles and policies of the CCP within their enterprise;

   c.   Oversee their enterprises' observance of Chinese laws and regulations, and;

   d.   Be ready to perform surveillance, espionage or other related acts when directed by the CCP -- using their company as cover if the enterprise has business overseas.

8.      As such, every business enterprise that operates in China can be co-opted to serve the interests of the CCP, which would include acting as an agent for the CCP in the United States.

9.      The government of the PRC, guided by a totalitarian ideology under the absolute rule of the CCP, deprives citizens of their rights on a sweeping scale and systematically curtails freedoms as a way to ensure its continued retention of power.

10.     Moreover, it is clear that the United States is a particular target of this system.

11.     Additionally, the CCP is particularly concerned with any dissident activity that seeks to expose the CCP.

12.     So much so that the CCP have even infiltrated the NYPD, as evidenced by the recent exposure of a CCP spy in the NYPD -- Baimadajie Angwang, who it was discovered was not

only a spy of the CCP, but had infiltrated local expat groups. He was, "reporting to PRC government officials about the activities of Chinese citizens in the New York area and developing intelligence sources within the Tibetan community in the United States," *See* Dienst, Jonathan and Winter , Tom, <u>NYPD Officer Allegedly Acted as Agent for Chinese Government, Complaint Says</u>, Sept. 22, 2020. (https://www.nbcnewyork.com/news/local/crime-and-courts/nypd-officer-allegedly-acted-as-agent-for-chinese-government-complaint-says/2628293/). Copy attached as Exhibit "B".

13.     Thus, it is apparent that the CCP has spies in the US.

14.     There are also people in the US who actively oppose the CCP.

15.     The Plaintiff has on many instances joined with other like-minded individuals to protest against the CCP, in an effort to bring the rest of the world's attention to the wrongful acts of the CCP.

16.     It is not uncommon for people who undertake such efforts to expose the CCP's wrongful acts both within and without China, and it's less-than-friendly intentions for the United States, to become targets of the CCP for harassment, and worse, to discourage them.

17.     In 2018, the U.S.-China Economic and Security Review Commission issued a landmark report titled " China's Overseas United Front Work." *See* Exhibit "C", Attached.[1]

18.     The report, an official US Government document, which is dated August 24, 2018, provides details regarding the efforts of the CCP to, *inter alia*, "carry out influence operations" in the United States, and elsewhere. *See* Id., at 3.

---

[1] https://www.uscc.gov/sites/default/files/Research/China%27s%20Overseas%20United%20Front%20Work%20-%20Background%20and%20Implications%20for%20US_final_0.pdf

19.     "It is precisely the nature of United Front Work to seek influence through connections that are difficult to publicly prove and to gain influence that is interwoven with sensitive issues." *See* Id.

20.     "The CCP continues to lay the groundwork in the United States for United Front operations that could be similar to those that have achieved success in some U.S.-allied countries...." *See* Id.

21.     "The CCP has…in certain instances has infringed upon – and potentially criminally violated – rights to freedoms of speech and association that are guarantees to Americans and those protected by U.S. laws." *See* Id. at 3-4.

22.     The CCP under General Secretary Xi Jinping has put enormous resources into influence abroad, estimated at $10 billion a year.

23.     Xi has elevated and expanded United Front activities, a so-called "magic weapon" that relies on coopting Chinese diaspora communities and building relationships with Western enablers to make the "foreign serve" the CCP. The CCP builds varied and long-term relationships.

24.     The PRC has a distinctive system that blurs the lines between classical espionage, clandestine operations, and influence-seeking.

25.     Defendant O'Melveny represented BGI (formerly Beijing Genomics Institute), a China based genomic research and sequencing company, in its US$117.6 million acquisition of Nasdaq listed company Complete Genomics (Complete), a major supplier of DNA sequencing technology, in 2013.

26.     The transaction marked the first ever acquisition of a US publicly traded company by a Chinese acquirer and Defendant O'Melveny steered BGI through the regulatory approval process in the US and China.

27.     On July 20, 2020, Two BGI entities, "Xinjiang Silk Road BGI" and "Beijing Liuhe BGI", were added to the Entity List of The Department of Commerce's Bureau of Industry and Security (BIS) for "conducting genetic analyses used to further the repression of Uyghurs and other Muslim minorities in the Xinjiang Uyghur Autonomous Region."

28.     In January 2021, Reuters reported that BGI has worked with China's military -- the People's Liberation Army (PLA), and affiliated institutions such as the National University of Defense Technology, on efforts to enhance soldiers' strength and other projects.

29.     In July 2021, Reuters reported that BGI developed a prenatal test with the assistance of the People's Liberation Army, which is also used for genetic data collection. In one BGI study, the data is used to "single out Tibetan and Uyghur minorities to find links between their genes and their characteristics".

30.     In October 2022, the United States Department of Defense added BGI Genomics Co., Ltd, a listed subsidiary of BGI, to a list of "Chinese military companies" operating in the US as part of its effort to "highlight and counter the PRC Military-Civil Fusion strategy, which supports the modernization goals of the People's Liberation Army (PLA) by ensuring its access to advanced technologies and expertise are acquired and developed by PRC companies, universities, and research programs that appear to be civilian entities."

31.     While Defendant O'Melveny nominally provided services to BGI, it effectively provided services to the CCP government and its Military-Civil Fusion strategy.

**<u>JURISDICTION</u>**

32.     The United States District Court for the Southern District of New York has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (Federal Question).

33.     This Court has personal jurisdiction over Defendant City because it is incorporated and/or maintains its principal place of business in the State of New York. This Court has personal jurisdiction over the Officer Defendants because, on information and belief, they each reside in the State of New York.

34.     This Court has further jurisdiction because the events giving rise to this action occurred within the State of New York.

35.     The United States District Court for the Southern District of New York may exercise personal jurisdiction over the Defendants, pursuant to New York Long Arm CPLR 302 (a)(1) on the grounds that the significant events complained of occurred, or happened in, New York City and State.

### **FACTS**

36.     The Plaintiff is a foreign born ethnic Chinese US Resident.

37.     On numerous occasions on and before December 20, 2022, the Plaintiff has joined with other ethnic Chinese in the United States to lawfully and peacefully protest against the CCP.

38.     The Plaintiff is entitled, by law, to the rights afforded by the United States Constitution.

39.     The Plaintiff's rights under the United States Constitution have been violated due to the acts, or failures to act, of the Defendants.

40.     The Plaintiff is part of a protected minority class of people -- ethnic Chinese who are protesting, in the exercise of rights afforded under the US Constitution, against the CCP in the United States.

41.     These same protestors, by default, also seek to protest against people who serve the CCP and its interests in the United States. And they do so based on the information they are able to gather.

42.     As of January 2023, Defendant O'Melveny has, upon information and belief, at least three offices in the PRC with approximately 45 lawyers.

43.     Upon information and belief, Defendant O'Melveny's work in PRC is not only extremely lucrative, it is also work that has potentially significant impact on the country in terms of finance, infrastructure, energy and etc.

44.     The actions of Defendants' O'Melveny and Sarnoff have contributed to the PRC's and CCP's efforts to harass, intimate, defame and deny the Constitutional rights of the Plaintiff, and of those similarly situated.

45.     Upon information and belief, Defendant Sarnoff has been conspicuous in his activity on behalf of the CCP, and as a result was made an objective for protest by the group of Chinese dissident with which the Plaintiff joins.

46.     By virtue of its size in China, the significance of its legal work there, and presence, as signified by three offices in China, Defendant O'Melveny is compelled, whether by choice or as a result of coercion, to serve the CCP.

47.     In any case is would appear that Defendant O'Melveny is beholden to the CCP, and as such performs whatever acts are requested by the CCP -- including acts within the United States that would require registration as foreign agents with the US Government.

48.     The Plaintiff is an individual residing in Edgewater, New Jersey.

49.     Defendant Sarnoff is, upon information and belief, to be a resident of the State of New York.

50.     Defendant O'Melveny is a Delaware registered Limited Liability Partnership, and regularly transacts business in the State of New York.

51.     Defendant Carl M. Stanton (hereinafter "Defendant Stanton"), upon information and belief, is a resident of the City and State of New York.

52.     Defendant City of New York (City) is a municipal corporation organized and existing under the laws of the State of New York and maintains its principal office in the County of New York.

53.     OFFICER JOHN DOE 1 (hereinafter "Officer 1"), by virtue of being a New York City police officer, is believed to be a resident of New York State.

54.     OFFICER JOHN DOE 2 (hereinafter "Officer 2"), by virtue of being a New York City police officer, is believed to be a resident of New York State.

55.     OFFICER JOHN DOE 3 (hereinafter "Officer 3"), by virtue of being a New York City police officer, is believed to be a resident of New York State.

56.     OFFICER JANE DOE (badge # 11973), by virtue of being a New York City police officer, is believed to be a resident of New York State.

57.     The Plaintiff, as well as many other ethnic Chinese who have escaped to, and reside in, the United States, and now protest against the CCP, has been subjected to an ongoing campaign of harassment by agents of the CCP.

58.     Many of these Chinese people in the United States live in fear of the CCP, and its agents in the United States.

59.     This fear stems from the fact that the CCP has made harassment and intimidation a major part of its strategy to silence any criticism of its behavior by anyone in the United States, including ethnic Chinese.

60.     The aforementioned harassment and intimidation takes various forms, including: infiltration; defamation in media; illegal surveillance; physical intimidation; threats against family members, etc.

61.     Defendants O'Melveny and Sarnoff, using whatever resource to do so, have conscripted elements of the NYPD to oppose the protestors who, like the Plaintiff, have been appearing, and peacefully demonstrating.

62.     In this instance, by coopting the City of New York, the New York Police Department, and certain members of the New York Police Department, together with agents of the CCP --Defendants Stanton, Sarnoff and O'Melveny -- have conspired to violate, and have violated, the Plaintiff's rights under the Constitution of the United States of America.

63.     Such violation was done at the behest of the CCP, through its unregistered agents in the US.

64.     Such agents are now believed to be Defendant Sarnoff, Defendant O'Melveny and Defendant Stanton.

65.     Prior to December 20, 2022, the Plaintiff has had occasion to join in peaceful protests against Defendant O'Melveny because of its ongoing and widespread service to the CCP.

66.     As the sole political party in China, the CCP is believed by the Plaintiff, along with many others, with good reason, to be an evil and inhumane totalitarian regime, based on its long history of horrific abuses and inhumane policies.

67.     Along with a number of other people, the Plaintiff joined in peaceful protests at the office of Defendant O'Melveny on November 22, 2022.

68.     Then, commencing on December 2, 2022, the Plaintiff with a number of other people, joined in regular peaceful protests at a location believed to be in proximity to the home of Defendant Sarnoff.

69.     During protests that occurred prior to December 20, 2022, the Plaintiff, and other protestors like him, were constantly harassed by Defendant Stanton.

70.     Such harassment included:

a.   Defendant Stanton would stalk the Protestors, including the Plaintiff, every day that they would protest, following them in a Mercedes Benz GL 550 bearing New Jersey license plate number V23-KFH;

b.   Defendant Stanton refused to identify himself;

c.   Defendant Stanton took video and/or photos of the Protestors, including the Plaintiff, on a daily basis;

d.   Defendant Stanton tried to intimidate the Protestors, including the Plaintiff, by lingering close to the Protestors;

e.   Defendant Stanton made verbal threats directed at various protestors, including the Plaintiff, that he would arrest them, and/or that he would have them arrested;

f.   Defendant Stanton misrepresenting himself as a police officer, on at least one instance flashing a badge but not giving a badge number, or allowing anyone to inspect his credentials, if any, and finally;

g.   Defendant Stanton struck the Plaintiff from behind.

71.     On December 20, 2022, in the morning prior to 11:20 AM, the Plaintiff joined a group of people protesting at a location believed to be in proximity to the home of Defendant Sarnoff in New York, NY.

72.     On December 20, 2022 at or around 11:20 AM, the Plaintiff was exercising his First Amendment rights close to a location on West End Avenue in New York, NY which was believed by the Plaintiff to be the residence of Defendant Sarnoff.

73.     On December 20, 2022 beginning at or around 11:20 AM, Defendant Stanton was again stalking the Plaintiff and the other protestors from his vehicle.

74.     Defendant Stanton was first noticed by the Plaintiff while he and others were protesting on previous instances at Seven Times Square, New York, NY.

75.     Prior to December 20, 2022 the Plaintiff and other protesters had total 3 or 4 other conversations with him.

76.     Defendant Stanton was, on several instances, especially at the protest site outside Defendant O'Melveny New York Office located at 7 Time Square, taking pictures of the protestors from inside the property. This is important because the general public and the  protesters are not permitted onto the property.

77.     At least one protester witnessed that Defendant Stanton was able to go through the security entrance within 7 Time Square building by swiping a card.

78.     One week earlier, another protester had conversed with Defendant Stanton at the protest site by showing him an article about FBI's arrest of Wu, Xiaolei in the U.S. who stalked the protesters to CCP in the U.S. Defendant did not show up at the protest site for a couple of days until December 20. 2022.

79.     On December 20, 2022, as he had done previously, Defendant Stanton took photos and/or video of the Plaintiff and other protestors.

80.     When the Plaintiff and other protestors tried to engage Defendant Stanton to ask who he is , what he was doing, who he worked for, why he would follow plaintiff and other

protestors, he became aggressive and threatening. Plaintiff advised Defendant Stanton that he should stop stalking the protestors. Defendant Stanton responded: "I do what I do, you do what you do". He then indicated that he worked with or had some kind of connection NYPD.

81.     Defendant Stanton also said that he had some kind of "license", and said in a roundabout way that he was "with" the police. One time, Defendant even show the screen of his mobile phone to Plaintiff when the phone showing "NYPD" was calling Defendant Stanton

82.     Upon information and belief, Defendant Stanton is not an officer with the NYPD.

83.     The Plaintiff said that if Defendant Stanton did not stop, he would call 911.

84.     In response, Defendant Stanton, jumped out of his car he said "I will have you arrested."

85.     The Plaintiff then called 911. His first of two calls to 911 that day.

86.     At that point, Defendant Stanton returned to his vehicle, but stayed in very close proximity to the Plaintiff.

87.     The Plaintiff recalls that his first call to 911 happened at approximately 10:50 AM, and his second at approximately 10:56 AM -- therefore he had to call 911 twice to make sure they were coming because his first call was not timely addressed.

88.     After the Plaintiff's second call to 911, a total of three police cars appeared on the scene thereafter. It is clear in retrospect that none of them came to assist the Plaintiff, or any of the other protestors.

89.     Instead they were part and parcel of the effort to thwart the free exercise of the Constitutional rights of the Plaintiff and the other protestors.

90.     Upon information and belief, this effort against the Plaintiff was undertaken at the behest of Defendants O'Melveny, Sarnoff and Stanton.

91.     The first NYPD police car that appeared on the scene had one male and one female officer inside. They stopped when the Plaintiff flagged them down, but they refused to assist the Plaintiff, and said they were responding to a different call and continued on their way thereafter. The police officers in the first police car did not get out of the vehicle. They did ask Plaintiff whether he was injured and told him that more police officers were on the way.

92.     The second NYPD police car that appeared stopped 300 feet away. The officers in that vehicle, Officer 1 and Officer 2, did not communicate with the Plaintiff, nor did they identify themselves to the Plaintiff nor any of the other protestors.

93.     The Plaintiff could tell that the officers in the second NYPD police car were both middle-aged male officers.

94.     The Plaintiff was waiting for the second NYPD police car, or the officers inside it, to approach but they remained at a distance, apparently observing the Plaintiff and his fellow demonstrators.

95.      At this time, the Plaintiff was still standing in the same spot from which he had made his first call to 911, and with Defendant Stanton's car nearby.

96.     At that time, while the second NYPD police car, contained Officer 1 and Officer 2, remained at a distance, Defendant Stanton moved his car forward and made contact with Plaintiff's back – causing the Plaintiff to fall to the ground.

97.     The Plaintiff's back/lower back made contact with the car. He was pushed (1) down the roadway by Defendant Stanton's car, and Defendant Stanton did not stop until other protesters screamed at Defendant to stop.

98.     The Plaintiff was shocked by this assault and battery and remains traumatized by the event.

13

99.     The Plaintiff called out to the police in the second NYPD police car for aid, but they failed to respond in any way. The 2nd police vehicle, which came after Plaintiff was hit by Defendant's car,  waited for a long time before the officers inside the police car came out.

100.     The police officers from the second police vehicle did not talk to Defendant Stanton but directly accused Plaintiff of blocking the traffic even though Plaintiff was the one who called 911 and report the wrongdoing of Defendant.

101.     Shortly thereafter, and while the second NYPD police car with the two unidentified middle-aged male officers was still on the scene, a third NYPD police car appeared at the scene.

102.     This third police car contained one male (Officer 3) and one female officer (Officer Jane Doe), younger police officers that the two middle-aged male officers.

103.     At that point the younger officers who arrived last took control of the scene.

104.     The Plaintiff stated to the younger officers that he had called 911.

105.     The Plaintiff reported to the younger officers that Defendant Stanton has just struck him with his car.

106.     The Plaintiff reported to these officers that Defendant Stanton has been harassing them, filming and following them "for 30 days." The Plaintiff also said that "we have kids in our group" whom Defendant Stanton was endangering.

107.     The younger officers spoke briefly with Defendant Stanton, and then let him go. The Plaintiff does not know what was said between the younger officers and Defendant Stanton.

108.     The Plaintiff later was told there would not be a police report.

109.     The Plaintiff is unaware of any written record of the event created by the police.

110.    It is clear that there should have been a report, and the officers telling the Plaintiff that there would be no report was a clear attempt to cover up what was going on.

111.    In around 11:45 AM, the last police officers left the scene, as did Defendant Stanton. At that time, the Plaintiff, along with some of the other protesters, went to a nearby restaurant.

112.    When the Plaintiff entered the restaurant, the Plaintiff started to feel dizzy, short of breath, and he went into shock.

113.    The shock was a direct result of the events that had just transpired.

114.    One of the protesters called 911 again to request the information about the police officers. An ambulance for the Plaintiff was also requested.

115.    Shortly thereafter, the heretofore-mentioned third police car, with the younger male and female officers, came again in response. An ambulance also appeared at that time. At this time, the male officer asked Plaintiff to present ID information. The female officer told the medical personnel of the ambulance that Plaintiff 's "jumping on the car" was wrong even though she was not at the scene when the incident happened. Plaintiff never jumped on Defendant Stanton's car. Another protester requested the Badge Numbers of both police officers.

116.    The female officer stayed in the ambulance and indicated that the ambulance would not leave for the hospital until a supervisor came.

117.    During this time Officer 3, the male police officer from the third car, obstructed the Plaintiff's efforts to get medical attention.

118.    Officer 3 stood in the doorway to the ambulance, and prevented it from leaving. This lasted for several minutes. The officer did not explain why he tried to prevent the ambulance from leaving.   An Asian police officer did arrive. He was identified only as the supervisor.

Thereafter, when the officer finally allowed the ambulance to leave the Plaintiff was taken to the hospital.

119.    During this strange and suspect delay, the Plaintiff was able to observe the badge number of Officer Jane Doe, which was #11973, and he believes her name was something like "Doofyn".

120.    The Plaintiff was brought to Mount Sinai hospital and stayed there all afternoon.

121.    While he was in the hospital the Plaintiff received treatment.

122.    The Plaintiff remains under doctors care for the trauma he suffered.

123.    Proximately 20 protesters witnessed most or all of the events of December 20, 2022, described herein.

124.    The Plaintiff is now living in a state of constant fear and apprehension because he does not feel safe enough exercise his rights under United States Constitution without suffering further and more aggressive attacks.

125.    The Plaintiff is likely to continue to require doctor's care for the trauma he suffered on December 20, 2022.

## CLAIMS FOR RELIEF

### COUNT I

**Claim under 42 U.S.C. § 1983 for Violation of the Plaintiff's First, Fourth and Fourteenth Amendment Rights**

**(Against All Defendants)**

126.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 125 as if fully set forth herein.

127.     At all times relevant to this Complaint, the NYPD Officer Defendants were acting under color of state law.

128.     There is an inextricable nexus between the various Defendants, and as such all Defendants, public and private, are willful participants in depriving the Plaintiff of his rights, and as such the Defendants have a symbiotic relationship for purposes of 42 U.S.C. § 1983.

129.     As a result of this nexus, all acts by all the Defendants relate to Plaintiff's claims under 42 U.S.C. § 1983.

130.     All of the wrongful acts or omissions complained of herein against Plaintiff were carried out by the named Defendants, and the unnamed Defendant officers, pursuant to:

  a.   An explicit agreement among the Defendants to take steps against the Plaintiff as one of the Chinese protestors against the CCP;

  b.   A policy of the City of serving the interests of connected or influential individuals above others, especially minorities;

  c.   The formal policies, rules, and procedures of Defendant CITY;

  d.   Actions and decisions by Defendant CITY's policymakers to cooperate with Defendants O'Melveny and Sarnoff in efforts at silencing Chinese who are critical of the CCP;

  e.   Customs, practices so widespread and pervasive as to constitute de facto policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by CITY policymaking officials;

  f.   Defendant CITY's deliberate indifference to Plaintiff's rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as

evidenced by the CITY's failures, and the failures of the other policymaking

agents, to train, supervise.

131.    Any acts deemed to have been the result of negligence on the part of any of these

Defendants are sufficient to support the Plaintiff's 42 U.S.C. § 1983 claim.

132.    As a result of the foregoing the Plaintiff is now unable to resume the free exercise

of his First Amendment right to protest as he had been doing due to fear of continued, or more

intense, harassment.

133.    As a result of the foregoing, Plaintiff has suffered injuries and damages, and as

such, the Plaintiff claims compensatory damages for harm to the Plaintiff, punitive damages, and

additional compensatory damages based on value of constitutional rights, pursuant to which a jury

is permitted to award damages based on its own unguided estimation of value of such rights.

## COUNT II

## Claim for violation of 42 U.S.C.S. § 1985(3)

## (Against All Defendants)

134.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 133 as if fully

set forth herein.

135.    The Defendants have engaged in a conspiracy to deprive the Plaintiff, and indeed

any of his fellow Chinese dissident protestors, of his Constitutional rights.

136.    This conspiracy to deprive the Plaintiff of his rights exists by virtue of his race

and/or ethnicity, and was intended to prevent the Plaintiff from continuing to exercise his

Constitutional rights.

137.    The overt acts undertaken by these Defendants include but are not limited to:

a.  Agreement on the part of Defendants O'Melveny and Sarnoff to serve the interests of the CCP – including silencing Chinese dissident protest in the US;

b.  Repeated instances of harassment, intimidation, threats and physical assault by Defendant Stanton;

c.  As to the City and Officer Defendants, numerous overt acts were undertaken in furtherance of the conspiracy, including;

    i.  colluding with Defendants O'Melveny, Sarnoff and Stanton;

    ii.  failing to respond to 911 calls;

    iii.  failing to lend aid;

    iv.  failing to identify themselves at the scene;

    v.  failing to file a report on the incidents of December 20, 2022;

    vi.  hindering the rendering of medical attention on the scene;

    vii.  denial of repeated requests for assistance from the Plaintiff;

    viii.  failing to properly train patrol officers to avoid infringement of Constitutional rights of protestors;

    ix.  failing to supervise patrol officer to avoid infringement of Constitutional rights of protestors;

    x.  failing to monitor patrol officers with regard to interaction with agents of foreign powers.

138.  Defendants O'Melveny, Sarnoff and Stanton were jointly engaged with the other Defendants, and as such were also acting under color of law for purposes of 42 USC 1985.

139.  Defendants O'Melveny, Sarnoff and Stanton colluded with the other Defendants.

140.    Defendants O'Melveny, Sarnoff and Stanton took action against the group of protestors, with which the Plaintiff is a member, at the behest of the CCP.

141.    Defendants O'Melveny, Sarnoff and Stanton took action against the group of protestors, with which the Plaintiff is a member, in retaliation for their protests.

142.    Defendants O'Melveny, Sarnoff and Stanton have used its contact, connections and/or political leverage to recruit the other Defendants help.

143.    The Defendants were motivated by racial animus against the Plaintiff and his fellow protestors.

144.    As a  result of the Defendants various acts of wrongdoing the Plaintiff has been harmed.

145.    The Plaintiff is suffering trauma from the events of December 20, 2022. Not only is the harm he suffered recoverable in its own right, it also now prevents him from exercising his rights.

## COUNT III

### Claim for First Amendment Retaliation Pursuant to 42 U.S.C. § 1983

### (Against All Defendants)

146.    The Plaintiff repeats and realleges the allegations in Paragraphs 1 through 145 as if fully set forth herein.

147.    The Plaintiff's right to protest, and to speak out in public, are rights fully protected by the US Constitution.

148.    The Defendants took the above-described actions when they were fully aware that the Plaintiff had previously protested against the Defendants O'Melveny and Sarnoff and their connections to the CCP.

149.     In committing the acts and omissions complained of herein, Defendants acted under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiff of the rights protected by the First Amendment to the United States Constitution.

150.     Defendants (a) retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in falsely arresting Plaintiff, in subjecting Plaintiff to excessive force, in selectively enforcing laws and regulations against Plaintiff, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

151.     Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's perceived protected speech and/or conduct.

152.     Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

153.     Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar conduct in the future.

154.     As a result of the foregoing, Plaintiff suffered injuries and damages.

155.     The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that protected punitive damages should be imposed against them.

## COUNT V

### Failure to Intervene Pursuant to 42 U.S.C. § 1983

### (Defendants City and Officers 1 and 2)

156.    The Plaintiff repeats and realleges the allegations in Paragraphs 1 through 155 as if fully set forth herein.

157.    It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.

158.    Officers 1 and 2 were situated in full and direct view of the Plaintiff on December 20, 2022 prior to the point in time that he was struck by Defendant Stanton's vehicle.

159.    Officers 1 and 2 were situated in full and direct view of the Plaintiff on December 20, 2022 at the point in time that he was struck by Defendant Stanton's vehicle.

160.    Officers 1 and 2 were in relatively close proximity to the scene to have lent aid.

161.    Officers 1 and 2 knew that the Plaintiff was one of the protestors at that time, and therefore knew that he was in the exercise of his Constitutional rights, and such knew that the interference at that time was interfering with the Plaintiff's rights.

162.    Officers 1 and 2 took no steps whatsoever to intervene.

163.    These individual defendants had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of Plaintiff's constitutional rights.

164.    As a result of the aforementioned conduct of the individual defendants, Plaintiff's constitutional rights were violated.

165.    Defendant Officers actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

166.     As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

## COUNT VI

### Claim for Assault and Battery

### (Against Defendant Stanton)

167.     The Plaintiff repeats and realleges the allegations in Paragraphs 1 through 166 as if fully set forth herein.

168.     On December 20, 2022 Defendant Stanton struck the Plaintiff with his vehicle.

169.     Upon striking the Plaintiff, Defendant Stanton did not stop his vehicle until such time as the Plaintiff was thrown to the ground.

170.     In the moments before the point in time that the contact occurred the Plaintiff was standing still, easily visible, and was not engaged in any provocative, aggressive or threatening activity.

171.     By the aforedescribed conduct, Defendant Stanton, or his agents, servants and employees, acting within the scope of their employment, intentionally, willfully and maliciously battered Plaintiff, when they, in a hostile and/or offensive manner struck Plaintiff without Plaintiff's consent.

172.     As a direct and proximate result of the actions of Defendant Stanton, the Plaintiff suffered damages including emotional distress.

**COUNT VII**

**For Declaratory Judgment To Compel Registration As Foreign Agents**

**(Defendants O'Melveny Sarnoff and Stanton)**

173.    The Plaintiff repeats and realleges the allegation s in Paragraphs 1 through 172 as if fully set forth herein.

174.    U.S. Congress enacted the Foreign Agents Registration Act ("FARA") , requiring "foreign agents" to register with the Attorney General.

175.    As amended over the years, it applies broadly to anyone who acts on behalf of a "foreign principal" to, among other things, influence U.S. policy or public opinion.

176.    FARA is an important tool to combat foreign influence in the United States. It creates transparency by requiring certain agents of foreign principals who are engaged in political activities or other activities specified under the statute to make periodic public disclosure of their relationship with the foreign principal.

177.    One "who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control" of a foreign principal is required to register under FARA. 22 U.S.C. § 611(c)(1). 22 U.S.C. § 612(a) provides that "No person shall act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement."

178.    Indeed, the Plaintiff requests the Court accept the claim under 22 USC §611 et seq, on the grounds that the Court is not, strictly speaking, obliged to disregard the Plaintiff's claims due to an absence of an explicit "private right of action" provision in the FARA statute, since only District Courts have, as of yet, opined on the issue, and there has been no appellate or Supreme Court ruling on whether a private right of action under FARA can be inferred.

179.    The Plaintiff believes that such right of action must be inferred where, as here, there has been a lack of enforcement action -- resulting in the violation of constitutional rights, and a blatant disregard of the rule of law.

### CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, Plaintiff claims damages of not less than $10,000,000, and respectfully requests:

   a.  The Court empanel a jury;

   b.  A declaratory judgment that Defendants O'Melveny, Sarnoff and Stanton must register pursuant to 22 USC 612;

   c.  An award of compensatory damages;

   d.  An award of punitive damages;

   e.  Additional compensatory damages based on value of constitutional rights, pursuant to which a jury is permitted to award damages based on its own unguided estimation of value of such rights;

   f.   The foregoing relief jointly and severally against all of the defendants in an amount in excess of the jurisdiction of all lower Courts;

   g.  An award costs and attorney's fees pursuant to 42 U.S.C. § 1988; and

   h.  Such other and further relief as the court may deem just and proper.


DATED:      January 18, 2023
            New York, NY

                              Respectfully submitted
                              for the Plaintiff


                              Yongbing Zhang
                              Law Offices of Yongbing Zhang

223 West Jackson Boulevard, Suite 1012
Chicago Illinois 60606
Tel.: 312-750-9889
Fax: 312-750-9880
Email: yzhang@ybzlaw.com

Richard N. Freeth, Esq.
Freeth & Associates LLC
260 Madison Ave., 8th Fl.
New York, NY 10016
Tel.: 917-775-7082
Email: rfreeth@freethfirm.com